**Turner O. WILEY, Plaintiff,**

v.

**UNITED PARCEL SERVICE, INC., Defendant.**

**No. 1:98CV00126.**

United States District Court, M.D. North Carolina.

Aug. 17, 1999.

Kathleen G. Sumner, Law Offices of Kathleen G. Sumner, Greensboro, NC, for Turner O. Wiley, plaintiff.

Jill Stricklin Cox, John J. Doyle, Jr., Constangy, Brooks & Smith, Winston–Salem, NC, for United Parcel Service, Inc., defendant.

### *MEMORANDUM OPINION*

OSTEEN, District Judge.

This matter is before the court pursuant to Defendant United Parcel Service, Inc.'s, (UPS) Motion for Summary Judgment. Plaintiff Turner O. Wiley originally filed this action in state court alleging that UPS terminated him and failed to reinstate him

in retaliation for having filed workers' compensation claims in violation of the North Carolina Retaliatory Employment Discrimination Act (REDA), N.C.Gen.Stat. § 95–241 *et seq.* (1998). Defendant removed to this court on the basis of diversity of citizenship. For the reasons discussed herein, Defendant's Motion for Summary Judgment will be granted.

### I. FACTUAL BACKGROUND

Plaintiff began working for UPS in the Greensboro, North Carolina, facility (Facility) in 1975. After holding various part-time positions for several years, Plaintiff became a full-time package car driver (driver) in 1979. (Pl.'s Dep. at 35–37, 41.) Plaintiff became medically disqualified as a driver in 1985. Specifically, while driving a UPS package car, Plaintiff suffered an epileptic seizure, lost consciousness, and struck another vehicle. *Id.* at 42–43, 45–46.

Plaintiff, a member of the International Brotherhood of Teamsters–Local Union No. 391 (Union), filed a grievance over UPS's refusal to allow him to continue driving. The grievance was resolved under an agreement in which UPS would file a workers' compensation claim based on the seizure and Plaintiff would be assigned to work inside the Facility after being released by the company doctor. (Pl.'s Dep. at 46–48, Dep.Ex. 2.)

After Plaintiff was released to work, he was assigned a full-time position in the loading/unloading and car wash areas. (Pl.'s Dep. at 48–50.) UPS created this position for Plaintiff. *Id.* at 314.[1] At this time, Plaintiff was one of only two UPS employees working full-time inside the Facility. *Id.* at 48–50. In 1986, Plaintiff began dividing his time between the car wash and small sort areas of the Facility. After 1½ to 2 months working an eight-hour shift in the small sort area, Plaintiff

---

1. Traditionally, the car wash was staffed by part-time employees who were qualified to

drive. (Snyder Dep. at 43–44.)

returned to his previous car wash/sorting job with reduced hours in the small sort This job required Plaintiff to work three hours in small sort and five hours in the car wash area (three/five schedule). (Pl.'s Dep. at 75, 114.) [2]

In 1993 and 1995, Plaintiff suffered a job-related back injury while lifting the hood of a package truck. In both instances, Plaintiff filed a workers' compensation claim, the claim was accepted by UPS, and Plaintiff received disability benefits. (Pl.'s Dep. at 67–70, 88–91, Dep.Exs. 7–8, 12–14.)

In June 1996, Plaintiff suffered an epileptic seizure at home. Plaintiff fell, dislocated his shoulder, and left UPS on disability leave. (Pl.'s Dep. at 97–100, Dep. Exs. 19–20.) In November 1996, Plaintiff filed a workers' compensation claim with respect to his shoulder injury. Plaintiff contended his epilepsy was an occupational disease and that the stress of his employment activated or accelerated the seizure. UPS and its insurance carrier denied the claim. (Pl.'s Dep. at 99–100, 120–21, Dep. Exs. 21–22, 28.) After Plaintiff was released to full-duty employment in January 1997, he returned to UPS and resumed working the three/five schedule. (Pl.'s Dep. at 110–11, 113, Dep.Ex. 25.)

About this time, Bob Latchford transferred to the Greensboro Facility as division manager and UPS underwent operational changes that affected the car wash area. Specifically, in order to reduce costs, UPS began washing each package car on an "as needed" basis instead of daily. (Pl.'s Dep. at 116.) UPS also eliminated overtime and reduced hours for all employees in the car wash. (Latchford Dep. at 128; Snyder Dep. at 49–51.) Because of the operational changes, in March 1997, Plaintiff's official three/five work schedule was changed to four hours in the small sort and four hours in the car wash (four/four schedule). (Pl.'s Dep. at 116, 121–22, Dep.Ex. 29; Latchford Dep. at 120–21.)

Plaintiff resisted the alteration in his work schedule and informed UPS that he did not intend to comply with the change. (Pl.'s Dep. at 145–46.) On several occasions, Plaintiff approached Latchford to express his dissatisfaction. Despite UPS's operational needs, Plaintiff claimed that his seniority entitled him to continue working the three/five schedule. *Id.* at 125. Plaintiff also believed he should be paid a higher rate for working an additional hour in the small sort.[3] *Id.* Plaintiff expressed concern that the restrooms were located too far from the small sort and complained that the sorter bins were not ergonomically correct. *Id.* at 131–32, 146–47.

In response to Plaintiff's objections, Latchford repeatedly explained that due to operational changes, there was no need for Plaintiff to work in the car wash for five hours each shift. Latchford reviewed Plaintiff's previous 1990– and 1994–wage related grievances and determined that Plaintiff was being paid the correct wage. Finally, Latchford evaluated the small sort area and determined that Plaintiff's work station was ergonomically correct. (Pl.'s Dep. at 123, 140–47, 155; Latchford Dep. at 214.) Although Plaintiff did not agree with Latchford's stance, he understood Latchford's position. (Pl.'s Dep. at 144–45.)

In March 1997, Plaintiff attempted to resume his former three/five schedule. Without authorization from UPS and contrary to Latchford's explicit instructions, Plaintiff left the small sort and went to the car wash at the end of three hours. (Pl.'s Dep. at 148–49, 155–57.) Latchford instructed Plaintiff that unless he continued working in the small sort as required by

---

**2.** Although Plaintiff was assigned to the three/five schedule, he often worked less than three hours in small sort and spent more time in the car wash. (Pl.'s Dep. at 114; Snyder Dep. at 50–51.)

**3.** Plaintiff had previously filed grievances with respect to various pay issues. The grievances were resolved adversely against Plaintiff. (Def.'s Br.Supp.Mot.Summ.J. at 4) (citing Pl.'s Dep. at 83–86).

the four/four schedule, his employment would be terminated for a work stoppage. *Id.* at 155–56. Plaintiff testified that following this incident, he complied with UPS's instructions and continued to work the four/four schedule from March 1997 until he was terminated on April 9, 1997. *Id.* at 155–59. Nevertheless, despite understanding the company's position, Plaintiff continued to approach Latchford to discuss the issue. Plaintiff also filed a grievance against Bill Snyder, his immediate supervisor in the car wash, for allowing the change to happen. (Pl.'s Dep. at 157–60, 174–75, Dep.Ex. 32.) [4]

At some point prior to his termination on April 9, 1997, Plaintiff told Latchford that if he worked in the small sort for four hours, he might have to use the restroom "20—some times on that particular day." (Pl.'s Dep. at 185.) According to Plaintiff, Latchford replied, "Nobody has to go to the bathroom 27 times; you better go get checked out." *Id.* at 187.

On April 9, 1997, Plaintiff once again went to Latchford's office to try and explain his position regarding the changed work schedule. Plaintiff closed Latchford's door behind him for "privacy reasons" and stated he risked further injury if he continued working the four/four schedule.[5] Plaintiff also argued his new schedule violated his seniority. *Id.* at 160–61. According to Plaintiff, Latchford became angry, jumped up from his chair, raised his voice and exclaimed, "We're not going to talk about this shit anymore." *Id.* at 164–66. Plaintiff, after explaining to Latchford that he believed Latchford had "cursed" him, told Latchford that there were other safety issues which needed to be addressed. Plaintiff insisted, "We still need to talk," and Latchford allegedly respond-

ed, "Well, we're not going to talk." Latchford then tried to leave the office.[6] *Id.* at 167–69.

Although Plaintiff was located between Latchford and the door, Plaintiff did not immediately move away from the door to allow Latchford to leave. *Id.* at 169. Instead, Plaintiff blocked Latchford's path for "[m]aybe fifteen seconds." Latchford immediately began yelling for help and Jeff York, a UPS supervisor, responded to Latchford's calls and tried to enter the office. *Id.* at 169–71. Initially, York was unable to open the door because Plaintiff was standing with his back to the door. *Id.* at 171. Until Plaintiff turned around and stepped aside, which took a couple of seconds, York could not enter the office. *Id.*

During this interaction, Latchford told Wiley he was terminated for failure to work as instructed and gross insubordination. (Pl.'s Dep. at 172–73; Latchford Dep. at 172–73.) Latchford and Plaintiff then went to see Mike McGaha, a Union official. Latchford explained that Plaintiff had blocked the door and refused to let Latchford out of his office. (Pl.'s Dep. at 178.) Latchford said he felt threatened. *Id.* Although McGaha told Latchford he did not have grounds to terminate Plaintiff based on the fact he felt threatened, Latchford reiterated that Plaintiff's employment had been terminated and that if Plaintiff did not leave of his own accord, he would be escorted off the premises. *Id.* at 179.

On April 14, 1997, Latchford sent Plaintiff a letter formally notifying him of his termination for failure to work as directed and gross insubordination. (Def.'s Br. Supp.Mot.Summ.J. at 6) (citing Pl.'s Dep. at 80, Dep.Ex. 33). Latchford was un-

---

**4.** This grievance was never pursued by the Union. (Pl.'s Dep. at 175–77.)

**5.** Plaintiff presented no medical evidence to support his contention. (Pl.'s Dep. at 133.)

**6.** There is factual dispute regarding whether there were one or two interactions. Latch-

ford testified he instructed Plaintiff to return to his work station and that Plaintiff came back to Latchford's office several minutes later and insisted they talk again. (Latchford Dep. at 173.) Because Plaintiff is the non-moving party, the court will accept the implication in his testimony that the entire course of events consisted of one interaction.

aware of Plaintiff's prior workers' compensation claims when he terminated Plaintiff. (Latchford Dep. at 204.) The Union filed a grievance based on Plaintiff's discharge and the grievance was upheld by the Atlantic Area Parcel Grievance Committee (AAPGC) on May 20, 1997. (Pl.'s Dep. at 180–81, 189–90; Dep.Exs. 34, 38.)

Following the AAPGC's decision, Plaintiff met with Latchford and another UPS official to discuss his return to work. Latchford told Plaintiff he had to return to the four/four schedule. Plaintiff disagreed and argued that the AAPGC's decision and his seniority entitled him to remain on the three/five schedule. (Pl.'s Dep. at 192–95; Latchford Dep. at 123, 126, 165–66.)

At the meeting, UPS officials expressed concern over Plaintiff's apparent need to use the restroom frequently.[7] UPS insisted that Plaintiff obtain a medical examination to verify this contention. *Id.* at 195. Plaintiff produced correspondence from two doctors stating that his seizure medication was a diuretic that caused frequent urination.[8] (Pl.'s Dep. at 195, Dep.Exs. 35, 36.) A physician designated by UPS affirmed that Plaintiff's medication could cause him to urinate 10–20 times in a four-hour period. The physician also concluded that Plaintiff's medication schedule should not be altered. (Pl.'s Dep. at 196–97, Dep. Ex. 38.)

Due to Plaintiff's refusal to work the four/four schedule and Plaintiff's need to urinate frequently during the first four hours of his shift, UPS did not have a job available for him on the twilight shift. Instead, UPS offered to assign Plaintiff to the same position starting on the midnight or sunrise shifts so the effects of his diuretic medication would have time to diminish prior to work. Plaintiff declined the

offer and stated that with more than 22 years experience, he was not interested in working different hours. (Pl.'s Dep. at 197–99, 205–207, Dep.Exs. 44, 45; Latchford Dep. at 124, 165–66, 169.) As a result, in late May or early June 1997, Plaintiff was placed on medical leave and told he should not return to work until he was approved by UPS. (Pl.'s Dep. at 201, 239–41, Dep.Ex. 60; Latchford Dep. at 166.)

In August 1997, the Union filed a grievance on Plaintiff's behalf concerning UPS's failure to reinstate Plaintiff to his former three/five schedule on the twilight shift. (Pl.'s Dep. at 209, Dep.Ex. 47.) The grievance was deadlocked before the AAPGC and the National Grievance Committee and was subsequently submitted to arbitration. (Pl.'s Dep. at 212–15, Dep.Ex. 49–52.)

In the fall of 1997, Plaintiff attempted to return to work without obtaining approval from the company. (Pl.'s Dep. at 239–41.) Plaintiff was told he was still on medical leave and that UPS had not approved his return to work. Additionally, UPS sent Plaintiff a letter in which the company stated: "In order for you to return from medical leave you must provide a note from your doctor stating that you can resume full-duty and perform the job without frequent or excessive time away from you [sic] assigned work stations." (Pl.'s Dep. at 240–41, Dep.Ex. 60.) Plaintiff was directed to forward any medical updates from his treating physician to UPS. *Id.*

UPS officials met with Plaintiff on December 5, 1997, to discuss his return to work. UPS offered Plaintiff two different unloading and sorting positions on the twilight shift. Plaintiff had previously performed the two jobs and both were located near restroom facilities. Plaintiff declined

---

7. UPS first learned of this contention on April 9, 1997, when Plaintiff told Latchford he would be unable to work four hours in the small sort area that day because he might have to use the restroom "twenty some times." (Pl.'s Dep. at 182–85, 254–55; Latchford Dep. at 167–68, 171.)

UPS also learned that instead of walking 200 yards from the car wash to the restroom, Plaintiff would, for convenience sake, urinate in the car wash drain. (Pl.'s Dep. at 131–33.)

8. The correspondence is dated May 14 and May 19, 1997. (Pl.'s Dep.Exs. 35, 36.)

the offers. (Pl.'s Dep. at 38, 48, 244–45, 249–53, Dep.Ex. 63.)

Plaintiff's physician released him to return to work effective March 16, 1998.[9] Plaintiff was permitted to perform full work duties in the small sort and car wash with the restriction of no lifting over 50 pounds, no squatting, and occasional bending and stooping. (Pl.'s Dep. at 256–59, Dep.Exs. 66–67.)

In early May 1998, UPS notified Plaintiff that the company had received Plaintiff's physician's most recent work restrictions and that the company remained concerned about Plaintiff's need to leave his work station to urinate up to 20 times in a four-hour period. According to UPS, the company was "willing to return [Wiley] to work in a job assignment within [his] medical restrictions as well as within a short distance from bathroom facilities." (Pl.'s Dep. at 275, Dep.Ex. 77.) Plaintiff deemed the offer insulting. (Pl.'s Dep. at 276, Dep.Ex. 78.)

The parties were unable to meet again to discuss Plaintiff's return to work and on January 18, 1999, Plaintiff's grievance regarding his reinstatement was denied by arbitrator James Scearce. (Pl.'s Dep. at 290, 306–07, Dep.Exs. 82, 86.) The arbitrator found that UPS:

> [W]as within its authority to deny [Plaintiff] the opportunity to return to the work schedule he held prior to June 3, 1997 [three/five schedule]. [UPS] has demonstrated sufficient cause to establish a work schedule that facilitates [Plaintiff's] apparent need to repeatedly urinate and minimizes the need for him to be absent from his work responsibilities, so long as such work assignment is within the medical limitations of [Plaintiff].... The [Plaintiff] must demonstrate the willingness and ability to perform the duties assigned.

(Dep.Ex. 86 at 17.)

In February 1999, Plaintiff returned to work at UPS as a fueler. The job allows Plaintiff to work within his lifting restrictions and is located closer to a restroom than the small sort or car wash areas. (Kociolek Dep. at 127; Latchford Dep. at 49–57, 65, 209–18, 220–21.)

## II. DISCUSSION

### A. *Summary Judgment Principles*

Summary judgment is appropriate in those cases where it is established through pleadings, affidavits, depositions, and other discovery documents that there exist no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, it is the burden of the moving party to show the court that no material factual issues exist for trial. Of course, the court must draw any permissible inference from the underlying facts as established in the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *Pulliam Inv. Co. v. Cameo Prop.,* 810 F.2d 1282, 1286 (4th Cir.1987).

When the moving party has carried its burden, the nonmoving party must come forward with evidence which shows more than some "metaphysical doubt" that genuine and material factual issues exist. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. A mere scintilla of evidence presented by the nonmoving party is insufficient to circumvent summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. Rather, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. *Id.* at 248–49, 106 S.Ct. at 2510–11. More specifically, "the court can determine that a trial is unnecessary only if either the facts are

---

9. Plaintiff's physician instructed him to undergo a functional capacity evaluation to help determine his working capacity. (Pl.'s Dep. at 256–59, Dep.Ex. 66.)

undisputed, or if disputed, the dispute is of no consequence to the dispositive question." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir.1993).

### B. *Retaliatory Discharge in Violation of North Carolina General Statute § 95–241*

The North Carolina Retaliatory Employment Discrimination Act (REDA), N.C.Gen.Stat. § 95–241 *et seq.*, prohibits employers from discriminating or retaliating against employees based upon good faith claims for workers' compensation. N.C.Gen.Stat. § 95–241(a). In order for an employee to prevail under this statute, the employee must prove that retaliatory motive was a substantial factor in the adverse employment actions taken by the defendant. *Johnson v. Friends of Weymouth, Inc.*, 120 N.C.App. 255, 259, 461 S.E.2d 801, 804 (1995), *disc. review denied*, 342 N.C. 895, 467 S.E.2d 903 (1996). The statute "does not prohibit all discharges of employees who are involved in a workers' compensation claim[;] it prohibits only those discharges made *because* the employee exercises his compensation rights. (Emphasis added.) The burden of proof in a retaliatory discharge action is on the employee." *Morgan v. Musselwhite*, 101 N.C.App. 390, 393, 399 S.E.2d 151, 153, *disc. review denied*, 329 N.C. 498, 407 S.E.2d 536 (1991) (decision based on N.C.Gen.Stat. § 97–6.1).

The North Carolina Supreme Court has recognized that federal decisions can offer guidance in establishing evidentiary standards in employment discrimination cases. *Abels v. Renfro Corp.*, 335 N.C. 209, 218, 436 S.E.2d 822, 828 (1993). Since Plaintiff has offered no direct evidence in support of his claim of retaliatory discharge, he must seek to establish his claim pursuant to the inferential proof scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

A plaintiff can establish a prima facie case of retaliation under the *McDonnell Douglas* proof scheme by demonstrating by a preponderance of the evidence that "(1) the employer was aware of [the] plaintiff's participation in protected activity; (2) that an adverse employment action was taken against the plaintiff engaged in the protected activity; and (3) that the two elements are related causally." *Strickland v. MICA Info. Sys.*, 800 F.Supp. 1320, 1323 (M.D.N.C.1992); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).[10] If the plaintiff presents a prima facie case and establishes that the filing of his workers' compensation claims were a substantial factor in the employer's adverse employment actions, "the burden shifts to the defendant to show that the same decision would have been made if the employee had not engaged in the protected activity." *Johnson*, 120 N.C.App. at 259, 461 S.E.2d at 804. REDA specifically provides:

> It shall not be a violation of this Article for a person to discharge or take any other unfavorable action with respect to an employee who has engaged in protected activity as set forth under this Article if the person proves by the greater weight of the evidence that it would have taken the same unfavorable action in the absence of the protected activity of the employee.

N.C.Gen.Stat. § 95–241(b).

Once the defendant articulates a legitimate nondiscriminatory reason for

---

10. The North Carolina Court of Appeals has set forth a similar legal standard for evaluating retaliation cases where an employee was terminated for filing an OSHA complaint, conduct protected under N.C.Gen.Stat. § 95–241. This standard requires the plaintiff to show that the protected activity was a substantial causative factor in the employee's ter-

mination, and that the employer has not shown by a preponderance of the evidence that it would have taken the same action against the employee in the absence of the protected activity. *Brooks v. Stroh Brewery Co.*, 95 N.C.App. 226, 230, 382 S.E.2d 874, 878, *disc. review denied*, 325 N.C. 704, 388 S.E.2d 449 (1989).

the discharge, the presumption created by the prima facie case is rebutted and "simply 'drops out of the picture.'" *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir.1996) (quotation omitted). The burden then shifts to the employee to show that the given reason was a pretext for retaliation. *See Evans*, 80 F.3d at 959. The plaintiff always bears the ultimate burden of proving that his employer intentionally retaliated against him and can fail to meet his burden not only by failing to establish a prima facie case, but also by failing to show a genuine factual dispute over the employer's legitimate nondiscriminatory reason. *Mitchell*, 12 F.3d at 1317.

■ Plaintiff has failed to establish a prima facie case of unlawful retaliation. With regard to Plaintiff's termination, Plaintiff has not established a causal connection with the filing of his workers' compensation claims. It is undisputed that Latchford, who arrived at the Facility in January 1997, did not know of Plaintiff's prior workers' compensation claims when he terminated Plaintiff's employment on April 9, 1997.[11] (Latchford Dep. at 204.) Because Latchford, the decision maker, knew nothing of Plaintiff's prior workers' compensation claims, the employment decision could not have been motivated by retaliatory intent. *See, e.g., Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998) (citations omitted); *Lewis v. Runyon*, No. 96–

1845, 1996 WL 733936 (4th Cir. Dec.24, 1996).

■ In workers' compensation retaliation cases, North Carolina courts also look for a "close temporal connection between [the] plaintiff's instituting a charge and his termination." *Shaffner v. Westinghouse Elec. Corp.*, 101 N.C.App. 213, 216, 398 S.E.2d 657, 659 (1990) (finding no close temporal connection where plaintiff was ultimately terminated three months after instituting a workers' compensation claim in light of evidence that the plaintiff had previously received benefits for compensable injuries), *disc. review denied*, 328 N.C. 333, 402 S.E.2d 839 (1991). In the case at bar, Plaintiff filed workers' compensation claims in April 1993, January 1995, and November 1996. Therefore, his most recent claim was brought approximately five months before his discharge in April 1997 and six months prior to Defendant's refusal to reinstate Plaintiff in May 1997. Under North Carolina law, these events are not sufficiently close in time to establish a causal connection. *Id.*

Plaintiff has testified that several facts demonstrate UPS's retaliatory motive. First, Plaintiff contends the universal workers' compensation claims faced by UPS coupled with Plaintiff's workers' compensation claims created an incentive on the part of UPS to discharge him.[12] (Pl.'s Dep. at 310–13.) Second, Plaintiff argues that retaliatory motive may be inferred because UPS did not accept responsibility and treat his 1985 seizure and accident as

---

11. In Plaintiff's Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment, Plaintiff contends that "Latchford ... testified that he never was aware of Turner Wiley's workers' compensation claim, even though he testified at the Industrial Commission hearing regarding ... Wiley's workers' compensation claim." (Pl.'s Supp.Mem. Opp'n Def.'s Mot.Summ.J. at 1) (citing Latchford Dep. at 116–19). However, the Industrial Commission hearing took place more than a month after Plaintiff's termination and at no point has Plaintiff presented evidence that Latchford knew of Plaintiff's workers' compensation claims at the time he was fired.

12. Following Plaintiff's accident in 1985, UPS created a special shift and assignment for Plaintiff. The company accepted workers' compensation claims filed by Plaintiff in 1993 and 1995 and modified his job duties to accommodate his physical restrictions. At one point, Plaintiff described his duties in the car wash as filling buckets with soap and water. (Snyder Dep. at 41, 51.) In 1997, Plaintiff's sole responsibility in the car wash consisted of washing the package car windows. *Id.* at 41–42. This conduct on the part of UPS does not give rise to an inference of retaliatory motive.

a workers' compensation injury.[13] *Id.* at 312, 314–15. Third, Plaintiff testified that because Latchford and other UPS employees involved in his termination had only recently arrived at the Facility, they would have no other reason to discharge him other than being ordered to do so by the company. *Id.* at 313. Finally, Plaintiff contends he was allowed to return to work without incident when his workers' compensation claims were accepted by the company, but was harassed and later discharged after his November 1996 claim was denied. *Id.* at 313–14, 316, 318.

None of these facts gives rise to an inference that UPS retaliated against Plaintiff for filing workers' compensation claims. Plaintiff has failed to establish a causal connection between the filing of his claims and any adverse employment action taken by UPS.[14] Plaintiff's good faith belief of retaliatory intent, without more, is not enough to withstand summary judgment. *See, e.g., Laughlin v. Metropolitan Washington Airports Auth.,* 952 F.Supp. 1129, 1140 (E.D.Va.1997) ("Even though all doubts must be resolved in [plaintiff's] favor, allegations alone will not defeat summary judgment.") (quotation omitted), *aff'd,* 149 F.3d 253 (4th Cir.1998); *EEOC v. Clay Printing Co.,* 955 F.2d 936, 945 (4th Cir.1992) (statement of subjective belief insufficient; affidavit not based on intuition).

Plaintiff also contends that UPS unlawfully failed to reinstate him to his previous three/five schedule after his grievance was upheld by the AAPGC on May 20, 1999. (Compl. ¶¶ 10–12; Pl.'s Dep. at 283–84, 325–26.) The court is not convinced that the failure to reinstate gives rise to a REDA claim. *See Sayers v. ABB C–E Serv., Inc.,* No. 4:97CV37 (W.D.N.C. Oct. 15, 1997) (REDA provides a remedy for retaliatory discharge and not the failure to recall). Nevertheless, Plaintiff has not established causation, and UPS's refusal to reinstate Plaintiff to his former schedule cannot be found to have been an adverse employment action. Plaintiff's former three/five schedule no longer existed at the Facility and Plaintiff adamantly refused alternative shifts and positions that would more effectively accommodate his medical condition. Defendant's actions complied with the collective bargaining agreement and the company was justified in placing Plaintiff in a job and work schedule that satisfied his lifting restrictions and more effectively accommodated his need to frequently urinate. (Pl.'s Dep. at 38, 48, 197–99, 205–07, 244–45, 249–53, 306–07, Dep.Exs. 44, 45, 60, 62, 86 at 16–17.)

Even if Plaintiff had established a prima facie case of retaliation, which he has not, Defendant would still be entitled to judgment as a matter of law. Defendant has established it "would have taken the same unfavorable action in the absence of the protected activity of the employee." N.C.Gen.Stat. § 95–241(b). It is undisputed that Latchford did not know of Plaintiff's prior workers' compensation claims at the time Plaintiff was terminated.

Although Plaintiff's grievance regarding his termination was upheld by the AAPGC, Plaintiff admitted he resisted the change in his work schedule and refused to work the four/four schedule on one occasion prior to his discharge. (Pl.'s Dep. at 148–49,

---

13. Twelve years had elapsed between Plaintiff's 1985 accident and his termination in 1997.

14. In addition, in Plaintiff's responses to Defendant's interrogatories, Plaintiff did not link his termination and failure to be reinstated with the filing of his workers' compensation claims. (Pl.'s Dep. at 306, Dep.Ex. 85.) Instead, Plaintiff speculated that UPS's employment decisions were due to a myriad of unrelated circumstances including Plaintiff's Union activities, an alleged conspiracy involving UPS and the Union, Plaintiff's belief that UPS wanted to rid the Facility of full-time employees, and speculation that Doug Starnes, UPS's district labor manager, had embarked on a personal vendetta against Plaintiff for filing a charge of wage discrimination with the National Labor Relations Board in 1996. *Id.*

155–57.) Plaintiff also admitted he was involved in an altercation with Latchford. Latchford felt intimidated and threatened by Plaintiff's conduct, called for help, and later terminated Plaintiff.

In Plaintiff's response to Defendant's motion for summary judgment, Plaintiff alleges Defendant's reasons for terminating Plaintiff and failure to reinstate him to his former three/five schedule are pretexts for retaliation and a genuine issue exists for trial. Plaintiff's evidence is based on conclusory allegations and his subjective belief that he is the victim of retaliation. This evidence is insufficient to withstand summary judgment. *See, e.g., Yarnevic v. Brink's, Inc.*, 102 F.3d 753, 757 (4th Cir. 1996) (citation omitted). Instead, Plaintiff must set forth sufficient evidence from which a jury could reasonably conclude that UPS retaliated against Plaintiff. *Clay Printing Co.*, 955 F.2d at 943.

■ Plaintiff relies on his affidavit for the proposition that he filed a workers' compensation claim in 1985 that UPS denied and that he worked as directed until his termination in April 1997. (Pl.'s Br. Supp. Denial Mot.Summ.J., Wiley Aff. ¶¶ 2–4, 12.) In the same affidavit, however, Plaintiff states it was his understanding "that [UPS] accepted my workers' compensation claim involving the seizure disorder on March 25, 1985." *Id.* ¶ 7. Plaintiff also unequivocally testified at his deposition that he did not file a workers' compensation claim based on the 1985 seizure and accident. (Pl.'s Dep. at 313–14, 321–22.)

Plaintiff's statement in his affidavit that he "worked as [he] was directed" before his termination is contradicted by Plaintiff's testimony that he did not intend to comply with the change to his work schedule and that on one occasion Plaintiff attempted to ignore the change in his sched-

ule and resume his former three/five schedule. (Pl.'s Br.Supp. Denial Mot. Summ.J., Wiley Aff. ¶ 12; Pl.Dep. at 145–49.) Because these portions of the affidavit directly contradict Plaintiff's earlier deposition testimony, the court will not consider these portions of the affidavit. *See, e.g., Rohrbough v. Wyeth Lab., Inc.*, 916 F.2d 970, 974–75 (4th Cir.1990).[15]

In his response, Plaintiff contends the following material facts reveal a retaliatory motive on the part of Defendant: (1) Although Plaintiff was released to part-time duty in December 1996 by his physician, UPS did not allow him to return to work until he was released to full-duty employment in January 1997; (2) Plaintiff's three/five schedule was suddenly changed after 12 years and he was not offered the higher rate of pay for working in the small sort; (3) Plaintiff was not immediately returned to work after the AAPGC arbitration decision sustained his grievance regarding his termination. (Pl.Br.Supp. Denial Mot.J. at 6–7, 10.)

None of these facts supports an inference of retaliatory intent. Plaintiff was allowed to return to his former three/five schedule as soon as he was released to return to full-duty employment. (Pl.'s Dep. at 110–11, 113, 116–17, Dep.Ex. 25.) Plaintiff had been released to return to work on a part-time basis on December 9, 1996, but the company was not required to place Plaintiff in a position that exceeded his medical limitations. There is no indication Plaintiff filed a grievance concerning any UPS delay in returning him to work. (Def.'s Reply at 7; Dep.Ex. 23.)

■ UPS changed Plaintiff's work assignment from the three/five schedule to the four/four schedule in March 1997 due to operational changes that required fewer employees in the car wash areas. The

---

15. The court will not consider Plaintiff's statement that UPS terminated his employment on the same day the company received notice of Plaintiff's workers' compensation claim and Plaintiff's assertion that he worked the three/five schedule continuously from 1985 until

March 1997. (Pl.'s Br.Supp. Denial Mot.J. at 2, 7, 10–11.) Plaintiff has submitted no evidence to support the former statement and the latter assertion is unsupported and contradicted by the record. (Def.'s Reply Br. at 5–6.)

court finds no causal relationship between Plaintiff's November 1996 workers' compensation claim and the change in his schedule which occurred four months later.

Plaintiff's repeated complaints of dissatisfaction with his pay rate predated and are not causally related to the filing of his workers' compensation claim. (Def.'s Reply Br. at 8) (citing Pl.Dep. at 83–86, 125–28, 142).

Finally, Plaintiff was not immediately reinstated in May 1997 after the AAPGC sustained Plaintiff's wrongful discharge grievance because Plaintiff refused to work the four/four schedule. (Pl.'s Dep. at 192–95; Latchford Dep. at 123, 126, 165–66.)

On July 8, 1999, with the court's permission, Plaintiff submitted a supplemental memorandum in opposition to Defendant's motion for summary judgment. Plaintiff cites to the deposition transcripts of several UPS officials and contends UPS's policy with respect to temporary alternate work is discriminatory under REDA. (Pl.'s Supp.Mem. Opp'n Def.'s Mot.Summ.J. at 1.) Plaintiff has never described the temporary alternate work policy to the court, and the court has examined the testimony of UPS officials and does not find any basis for a discriminatory policy.

Plaintiff also contends a pattern of discrimination exists at UPS that can be understood by comparing the company injury log and the grievance-related documents produced by UPS. *Id.* at 2–3.

The court is unable to discern any connection between the documents. It is correct that some employees who filed grievances also reported injuries to UPS, but this in no way creates an inference of discrimination against employees who sustain and claim a work-related injury. *Id.* at 3.

III. CONCLUSION

For the reasons discussed herein, Defendant's Motion for Summary Judgment will be granted.

A judgment in accordance with this memorandum opinion shall be filed contemporaneously herewith.