**William Michael BUMGARDNER, Plaintiff,**

v.

**SPOTLESS ENTERPRISES, INC., Defendant.**

**No. CIV. 1:02CV269.**

United States District Court, W.D. North Carolina. Asheville Division.

Oct. 22, 2003.

C. Frank Goldsmith, Jr., Goldsmith & Goldsmith, Marion, NC, Amy E. Ray, Asheville, NC, for plaintiff.

Grant B. Osborne, McGuire, Wood & Bissette, P.A., Asheville, NC, for defendants.

### MEMORANDUM OF OPINION

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendant's motion for summary judgment which is opposed by the Plaintiff. For the reasons stated below, the motion is denied.

## I. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986)). Thus, the Defendant as the moving party has the initial burden to show a lack of evidence to support Plaintiff's case. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiff who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. FINDINGS OF FACT

In this action, which is based on diversity jurisdiction, the Plaintiff has alleged claims for violations of the Retaliatory Employment Discrimination Act (REDA), N.C. Gen.Stat. §§ 95–241, *et seq.;* wrongful discharge in violation of North Carolina public policy; and negligent infliction of emotional distress.[1] Amended Complaint, filed October 14, 2003. The parties do not dispute the critical facts, only the inferences to be drawn therefrom.

Bumgardner was initially hired by the Defendant in August 1995 as a machinist and remained employed until his termination on January 16, 2002. His position was considered by the company as "skilled." Deposition of Lisa Osborne, filed October 14, 2003, at 12. His employment records show that he consistently received pay raises based on adequate performance. *Id.*, at 12–16. Lisa Osborne, the director of Human Resources for the Defendant, served on the safety committee with Bumgardner for six or seven years. *Id.*, at 38. During that time, Bumgardner was, at least part of the time, the chairman of the committee. *Id.* They met once a month to discuss any accidents which had occurred and toured the plant in order to note problems. *Id.* These were then presented to management for resolution. *Id.*

David Overbey was the supervisor of the tooling department while Bumgardner was employed by the Defendant. Deposition of David A. Overbey, filed October 14, 2003, at 10. Bumgardner was the machinist and CNC operator for that department. *Id.*, at 14. The CNC machine is actually a computer numerical controlled drilling machine which takes designs and creates codes that cut shapes into steel. *Id.*, at 16. In this manner, molds are produced. *Id.*

During the summer of 2001, Bumgardner noticed a pipe running through the tooling department which appeared to have a covering of asbestos insulation. *Id.*, at 66. Bumgardner raised the issue with two other members of the safety committee, supervisor Bruce Robinson and quality control manager Alan Decker. *Id.* Those individuals questioned the plant manager, Ralph Pena, about the asbestos and were told that when the plant was purchased "everything had been checked out and everything was safe." *Id.* Although Overbey related this to Bumgardner, Overbey did not think Bumgardner believed it was true. *Id.* As a result, Overbey told Bumgardner that he needed to "leave the pipe alone." *Id.*, at 67. In-

---

1. This action was removed by the Defendant from the General Court of Justice, Superior Court Division of Buncombe County, North Carolina. The Plaintiff has never objected to the removal; therefore, the Court will not address the issue of whether 28 U.S.C. § 1445(c) would prohibit the same. *Wiley v. United Parcel Service, Inc.*, 11 Fed.Appx. 176 (4th Cir.2001).

stead, Bumgardner took a sample from the pipe and had it tested. *Id.* Overbey considered this to be insubordination. *Id.* The sample tested did, however, contain asbestos. *Id.* Overbey was aware that Bumgardner was especially concerned about asbestos due to his father's death from asbestosis. *Id.,* at 77–78. However, Overbey felt that by cutting a sample from the pipe, Bumgardner had endangered his fellow employees. *Id.* Ultimately, the asbestos was removed from the pipe. *Id.,* at 79. When Bumgardner was terminated, Overbey was told only that the company no longer needed his services. *Id.,* at 83.

In December 2001, Bumgardner went to Pena, the plant manager, with a concern that the oil absorbent used at the plant to soak up hydraulic oil which leaked from the machines was being dumped improperly into the county landfill. Deposition of Ralph Pena, filed October 14, 2003, at 109. As a result of this conversation, the company began to use volcanic ash as an absorbent, although this was "exceptionally more expensive." *Id.,* at 110–11.

On December 21, 2001, Alan Decker, the quality control manager, reduced to written memorandum his conversation with Lisa Osborne on the same day. Exhibit A, *attached to* Plaintiff's Response to Motion for Summary Judgment ["Plaintiff's Response"], filed October 14, 2003.

> Yesterday, Mike Bumgardner had a conversation with me in the cafeteria. This was around 4:00 PM. He informed me that he had contacted EPA and a lady at EPA informed him that we were in violation for used oil disposal. He asked me to not mention this to anyone. I immediately went to Ralph and Bruce. Apparently, Mike Bumgardner was then counseled by Bruce and Tomas Mendez to the effect that Spotless was doing the right thing, and maybe he should contact his management with concerns before calling government agencies.

*Id.* Decker also reported in the memorandum that Bumgardner had confronted him after learning that Decker had disclosed the conversation. According to Decker, Bumgardner had been almost violent. Bumgardner denied this and also denied having called EPA. During the meeting to "counsel" him, Mendez told Bumgardner that if he had called the EPA, "Ralph [Pena] will fire your a-." Deposition of William Michael Bumgardner, filed October 14, 2003, at 131.

In December 2001, a worker named Juan Andrade was in an accident at work resulting in a severed toe. Deposition of Robert F. Scheiderich, filed October 14, 2003, at 63. Osborne, as the human resources director, was working with Andrade in connection with his workers' compensation claim. *Id.* Overbey told Scheiderich, vice-president of manufacturing, that Bumgardner was helping Andrade by contacting an attorney for him. *Id.* As a result, Scheiderich spoke with Andrade to make sure he felt he was getting all the assistance he needed from the company. *Id.,* at 63–64. Scheiderich thought that Bumgardner was unnecessarily meddling in something that was not his business. *Id.,* at 64.

Osborne testified that Andrade's claim was resolved without his having to make a formal claim through workers' compensation. Osborne Deposition, at 54. However, at one point, the company was having difficulty getting a written statement from Andrade's physician as to his permanent disability rating. *Id.* This held up the settlement and caused Andrade to think the company was not going to pay him. *Id.,* at 54–55. During the meeting with Andrade, someone mentioned that Bumgardner had advised Andrade to see an attorney due to the length of time it was taking to resolve his claim. *Id.,* at 55–56.

Bumgardner testified that Andrade, who barely spoke English, asked him to make an appointment with an attorney to get advice about the amount of settlement which would be appropriate. Bumgardner Deposition, at 72. Bumgardner did make an appointment for Andrade. *Id.* The attorney needed for Andrade to fill out certain documents prior to the appointment and asked Bumgardner for Andrade's address. *Id.* However, Andrade had gone back to work so Bumgardner told the attorney to mail the papers to him at work. *Id.,* at 72–73. A couple of days later, Overbey delivered a letter to Bumgardner which contained the attorney's letterhead and which was addressed to Andrade in the care of Bumgardner. *Id.* Overbey said to Bumgardner, "I hope you know what you're doing." *Id.*

After the safety committee met each month, Decker, as the quality control manager, would send a memorandum to Scheiderich and Pena with the minutes of the meeting. Exhibit H, *attached to* Plaintiff's Response, at Bates No. DEF100181. The June 2001 memorandum noted that housekeeping at the plant had "regressed dramatically, and this may be the worst case of lack of housekeeping that this team has observed to date." *Id.* Two "critical hazards" were reported and it was noted that maintenance had been aware of one of them for two weeks before the problem was fixed. *Id.* The July 2001 minutes reflect that the "safety committee has been complaining of poor housekeeping for the past three inspections. Unfortunately, this inspection did not produce any significant improvement." *Id.,* at Bates No. DEF100182. It was also noted that Decker could not ascertain whether work orders were being carried out. *Id.* A September 2001 memorandum noted that despite having brought in extra employees to clean the plant, housekeeping remained "much below par." *Id.,* at Bates No. DEF100183. Decker also reported to

management that, "I will re-emphasize that we are getting virtually no response to our formal documented safety work orders. Some of the requested work is being performed, but there is no effort by the responsible parties—Manufacturing and Maintenance Supervisors—to indicate completions to the safety team." *Id.* The January 2002 memorandum noted there had been an "[o]mission of corrective action: Maintenance checklists show no evidence of inspection/maintenance for Cords and caps, previously agreed to." *Id.,* at Bates No. DEF100184.

These reports came after the company hired a safety firm in late summer 2001 to do an OSHA audit of the plant. Bumgardner Deposition, at 110. The purpose of the audit was to have a list of everything that needed to be repaired. *Id.* The above referenced memoranda disclosed a continuing concern that the repairs were not being made. In December 2001, Bumgardner called OSHA and reported that the repairs had not been completed. *Id.,* at 112. In early January 2002, the OSHA representative called Bumgardner at work to inquire whether the repairs had been made. *Id.,* 114. Bumgardner replied that they had not and as a result, a few days later, an OSHA representative inspected the plant. *Id.,* at 114–15. Bumgardner was at work at the time and the first shift supervisor, Mendez, came into the tooling department and reported that he had just gotten out of a meeting with Pena. *Id.* Mendez had been told there was "a traitor in our midst and we've got to find it." *Id.* When Bumgardner inquired what he meant, Mendez replied that "somebody called OSHA on us." *Id.*

On January 3, 2002, Bumgardner received a two percent merit pay raise. Osborne Deposition, at 61. On January 16, 2002, Overbey terminated Bumgardner by telling him that his services were no longer

needed. Overbey Deposition, *supra.* Neither Scheiderich nor Pena knew at the time the decision was made to terminate Bumgardner that he had made a complaint with OSHA. In fact, Pena suspected two other employees who had recently been terminated. The final decision to terminate Bumgardner was made by Scheiderich based on recommendations from Pena and Overbey. Scheiderich Deposition, at 71.

At some point between the fall of 2001 and the time that Bumgardner was terminated, the company lost the K-mart account. Nonetheless, *during the month of January 2002 there was sufficient work in the tooling department to keep every employee working regular working hours.* Overbey Deposition, at 86. In addition, each employee worked overtime during that month. *Id.* In the week after Bumgardner was terminated, the remaining employees worked a total of 72 hours in overtime. *Id.,* at 87. The second week after Bumgardner was terminated, the company hired a replacement for him. *Id.* The other employees continued to work overtime. *Id.,* at 88–89.

### III. CONCLUSIONS OF LAW

#### A. The cause of action pursuant to REDA.

The Defendant first argues that Bumgardner has not shown a *prima facie* case of violations of REDA because he cannot show that retaliatory motive was a substantial factor in his termination. Section 95–241 of the North Carolina General Statutes provides in pertinent part:

(a) No person shall ... take any retaliatory action against an employee because the employee in *good faith* does or threatens to do any of the following:

(1) File a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to any of the following:

a. Chapter 97 of the General Statutes [the Workers Compensation Act].

b. Article 2A [Wage and Hour Act] or Article 16 [Occupational Safety and Health Act of North Carolina] ....

. . . . .

(2) Cause any of the activities listed in subdivision (1) of this subsection to be initiated on an employee's behalf.

(3) Exercise any right on behalf of the employee or any other employee afforded by Article 2A or Article 16 of this Chapter ....

. . . . .

(b) It shall not be a violation of this Article for a person to discharge or take any other unfavorable action with respect to an employee who has engaged in protected activity as set forth under this Article if the person proves by the greater weight of the evidence that it would have taken the same unfavorable action in the absence of the protected activity of the employee.

N.C. Gen.Stat. § 95–241. For purposes of the statute, a "person" includes a corporation and "retaliatory action" means "the discharge, suspension, demotion, retaliatory relocation of an employee, or other adverse employment action taken against an employee in the terms, conditions, privileges and benefits of employment." N.C. Gen.Stat. § 95–240.

Defendant argues that Pena and Scheiderich did not know before they terminated the Plaintiff that he had, in fact, made a complaint with the Department of Labor, OSHA. Thus, that complaint was not a *substantial* factor in the decision to fire him. In addition, Defendant claims

the Plaintiff's other grounds are based on mere speculation.

To succeed on his REDA claim, a plaintiff must demonstrate that "retaliatory motive was a substantial factor in the adverse employment actions taken by the defendant." Accordingly, proof that the adverse employment action is causally connected to the plaintiff's protected activity ... is an essential element to a REDA claim.

*Brown v. Sears Auto. Ctr.,* 222 F.Supp.2d 757, 762 (M.D.N.C.), *aff'd,* 51 Fed.Appx. 427 (2002), *cert. denied,* —— U.S. ——, 124 S.Ct. 126, 2003 WL 21339648 (2003) (quoting *Wiley v. United Parcel Serv., Inc.,* 102 F.Supp.2d 643, 650 (M.D.N.C.1999)). Defendant claims the Plaintiff has failed to forecast evidence of the substantial factor element. For purposes of the motion, the Court will assume *arguendo* that the asbestos incident in the late summer of 2001 is too remote in time to show a causal connection. *See, Salter v. E & J Healthcare, Inc.,* 155 N.C.App. 685, 691, 575 S.E.2d 46, 50 (2003) ("[T]here is no close temporal connection between plaintiff's instituting a workers' compensation claim and her termination."); *Hutton v. Closson Freightways, Inc.,* 584 S.E.2d 108, 2003 WL 21961383 (N.C.App.2003).

█ Nonetheless, the evidence does show, from testimony predominantly from individuals other than Bumgardner, that his inquiry about the use of an oil absorbent in December 2001 resulted in the company changing to an absorbent which was "exceptionally more expensive." Decker, who served on the safety committee with Bumgardner, reported to Pena that Bumgardner had called the EPA about the absorbent. This resulted in an arguably adverse employment action: Bumgardner was "counseled" and warned by Mendez, a supervisor, that if he called the EPA, Pena would fire him. *Salter, supra.* (**"The former law merely pro-**

**tected employees against discharge and demotion. By enacting REDA, however, the General Assembly expanded the definition of retaliation to include ... 'other adverse employment action taken against an employee in the terms, conditions, privileges, and benefits of employment.'"**); *Monroe v. BellSouth Telecommunications, Inc.,* 2003 WL 22037720, *5 (M.D.N.C.2003) (A disciplinary warning placed in an employee's personnel folder is an adverse employment action.); *Johnson v. Trustees of Durham Technical Cmty. Coll.,* 139 N.C.App. 676, 682, 535 S.E.2d 357, 362 (2000) ("[I]n enacting REDA, the General Assembly broadly defined retaliatory action as ... *'other adverse employment action'* ....").

During the same time period, Scheiderich admitted that he thought Bumgardner was "meddling" in Andrade's workers' compensation matter although it was none of Bumgardner's business. Overbey was bothered enough about the incident to report it to Scheiderich. Overbey, while delivering the letter addressed to Andrade in care of Bumgardner, warned him, "I hope you know what you're doing."

In January 2002, a representative from OSHA contacted Bumgardner at work. On the same day that the inspection occurred, Mendez reported Pena's opinion that a "traitor" in the plant had called OSHA.

It does not require a "leap of faith" to infer that Bumgardner's behavior during the month of December 2001 had brought him to the attention of Overbey, Pena and Scheiderich. To state that they did not *know* that Bumgardner called OSHA at the time he was fired is an oversimplification. *Brown, supra* (**No causal connection can be shown where the supervisor did not know of the OSHA complaint at the time of termination**). They may not have known; but certainly, in view of

Bumgardner's behavior and the accusations made against him during December, it is a question for the jury as to whether they suspected him. Indeed, a jury might adversely determine the credibility of these individuals. *Caudill v. Dellinger*, 129 N.C.App. 649, 655, 501 S.E.2d 99, 103 (1998).

Defendant next argues that it would have fired Bumgardner in any event; thus, no cause of action under REDA exists. Defendant also claims that once it has raised a valid reason for terminating him, the burden then shifts back to the Plaintiff to show the reason was mere pretext. This Court declines to impose the *McDonnell Douglas*[2] test onto the REDA.

> In *Abels v. Renfro Corp.*, 335 N.C. 209, 215, 436 S.E.2d 822, 825 (1993), the North Carolina Supreme Court declined to adopt "the complicated analysis used in federal employment discrimination cases as a model for how a retaliatory discharge case based upon the filing of a workers' compensation claim should be developed in our North Carolina courts."... In *Abels*, the North Carolina Supreme Court relied upon the "terms of the statute itself" to determine if the plaintiff in the case had made a showing necessary to withstand a motion for directed verdict and motion for judgment notwithstanding the verdict.... [T]he analysis under either *McDonnell Douglas* or the North Carolina statute would be nearly identical. In both instances, [Bumgardner] must show a causal connection between [his conduct] and [his] termination, and [Defendant] would be entitled to summary judgment upon a showing that it would have terminated [Bumgardner's] employment in any event. *Under the REDA, however, [Defendant] has a burden of persuasion, not production, in making this showing.*

*Wilkerson v. Pilkington North America, Inc.*, 211 F.Supp2d. 700, 706 n. 4 (M.D.N.C.2002) (emphasis added). The affirmative defense, then, must be shown by the greater weight of the evidence, not by merely raising a valid excuse.

Overbey suggested Bumgardner for termination to Pena and Scheiderich in early January 2002 when it was determined that there would be lay-offs. Pena Deposition, at 19–20. When Pena terminated Bumgardner, he did it outside of the plant because "Mike had shown an increasing, uh, unrestraint against supervisory people[.]" *Id.*, at 21. Pena was instructed not to provide any reason to Bumgardner for his termination. *Id.*, at 22. When pressed to provide all the reasons for terminating Bumgardner, Pena noted that Plaintiff had been involved with "run-ins" with both Scheiderich and Decker. *Id.*, at 24. He had a hostile attitude toward management. Id. The economic slow down was "the catalyst." *Id.*, at 25. Pena testified that the plant simply had too many employees, although the tooling department was not overstaffed. *Id.*, at 26. He also testified that although Bumgardner was not needed in the tooling department, a week after Bumgardner was terminated, the plant hired a replacement. Id., at 28. There are also inconsistencies in the reasons given by Scheiderich for his decision to terminate Bumgardner. Whether the Defendant has met its burden of persuasion, based on these facts, is a question for the jury. *Abels, supra; Brewer v. Cabarrus Plastics, Inc.*, 130 N.C.App. 681, 504 S.E.2d 580 (1998).

**B. The cause of action based on a violation of North Carolina public policy.**

 Although North Carolina is an employment-at-will state, its courts have

---

**2.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

recognized a limited exception for the violation of state public policy. *Salter*, 155 N.C.App. at 692–93, 575 S.E.2d at 51.

Public policy is defined as "the principle of law that holds no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." There is no specific list of what actions constitute a violation of public policy. However, wrongful discharge claims have been recognized in North Carolina where the employee was discharged (1) for refusing to violate the law at the employer[']s request, (2) for engaging in legally protected activity, or (3) based on some activity by the employer contrary to law or public policy[.] Under this public policy exception, the employee has the burden of pleading and proving that the employee's dismissal occurred for a reason that violates public policy. To establish a *prima facie* case of retaliation, it must be shown that (1) the plaintiff engaged in a protected activity, (2) the employer took adverse action, and (3) there existed a causal connection between the protected activity and the adverse action.

*Id.* (citing *Ridenhour v. IBM Corp.*, 132 N.C.App. 563, 568–69, 512 S.E.2d 774, 778 (1999)); *accord, Brackett v. SGL Carbon Corp.*, 158 N.C.App. 252, 580 S.E.2d 757 (2003). Because the undersigned has concluded that there is an issue of fact for the jury as to whether there is a causal connection between the "protected activity" which is alleged in this case, summary judgment on the issue of wrongful discharge in violation of public policy is also inappropriate.

## C. The cause of action for negligent infliction of emotional distress.

Defendant claims this cause of action must be dismissed because the only allegations in the complaint relate to the wrongful termination of Bumgardner's employment. A cause of action for negligent

infliction of emotional distress has three elements: "(1) defendant engaged in negligent conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress and (3) defendant's conduct, in fact, caused severe emotional distress." *Wells v. N.C. Dep't of Corr.*, 152 N.C.App. 307, 322, 567 S.E.2d 803, 814 (2002). Wrongful termination is not necessarily always intentional. In fact, based on the inconsistencies in some of the testimony regarding the reasons for terminating Bumgardner, it may well be that the supervisors negligently relied on improper information in deciding to discharge him. If no evidence of negligence is presented during trial, the Defendant may renew the motion at the close of Plaintiff's evidence.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion for summary judgment is hereby **DENIED**.