**Mary Ann GREENE, Plaintiff,**

v.

**DIALYSIS CLINIC, INC., Defendant.**

**CIV. No. 1:00CV95.**

United States District Court,
W.D. North Carolina,
Asheville Division.

June 13, 2001.

**230**

W. Robinson Deaton, Jr., Shelby, NC, for Plaintiff.

Stacy K. Wood, Kristi E. Kessler, Parker, Poe, Adams & Bernstein, Charlotte, NC, Timothy K. Garrett, Bass, Berry & Sims, PLC, Nashville, TN, for Defendant.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Plaintiff's timely filed objections to the Memorandum and Recommendation of United States Magistrate Judge Max O. Cogburn, Jr. Pursuant to standing orders of designation and 28 U.S.C. § 636, the undersigned referred the Defendant's motion for summary judgment to the Magistrate Judge for a recommendation as to disposition. Having conducted a *de novo* review to those portions of the recommendation to which specific objections were filed, the recommendation is adopted and the Defendant's motion is granted. 28 U.S.C. § 636(b); Fed.R.Civ.P. 72.

### I. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the Defendant as the moving party has the initial burden to show a lack of evidence to support Plaintiff's case. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiff who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. STATEMENT OF FACTS

Plaintiff's claim in this action based on diversity jurisdiction is an alleged violation of North Carolina's Retaliatory Employment Discrimination Act (REDA), N.C. Gen.Stat. § 95–241, *et. seq.* Plaintiff maintains the Defendant terminated her employment as a nurse because she filed two claims for workers' compensation.

Plaintiff was first employed by the Defendant as a staff nurse at the Cleveland Regional Medical Center in August 1987. Exhibit 3, Deposition of Mary Ann Greene, *attached to* Defendant's Motion for Summary Judgment, at 19. The Defendant is a non-profit corporation which provides medical treatment to patients suffering from end-stage renal disease. Exhibit 22, Affidavit of Bryan J. Fore, *attached to* Defendant's Motion. Most of the treatment provided is dialysis. *Id.* In September 1996, Plaintiff injured her back during her shift at the facility and ultimately filed a claim for workers' compensation. Greene Deposition, at 23. Plaintiff was placed on medical leave effective October 9, 1996, and was advised that this leave would expire on January 1, 1997. *Id.,* at 32; Exhibit 4, Letter dated December 10, 1996, *attached to* Defendant's Motion. She was also advised to request any extensions in writing by December 20, 1996. *Id.* At her request, leave was extended until her return visit to her physician. Greene Deposition, at 45. On January 8, 1997, Plaintiff's physician released her to return to work with the following restrictions: (1) no lifting over 10 pounds; (2) no repetitive bending; (3) no pushing or pulling; (4) light duty; (5) two-hour work days for two weeks, followed by four-hour work days for two weeks, followed by six-hour work days for two weeks; and (6) a final restriction of eight-hour work days during a five-day work week. *Id.,* at 30–31, 33, 46; Exhibit 5, Physician's Release, dated January 8, 1997, *attached to* Defendant's Motion. Contrary to this schedule, all other staff nurses at the facility were required to work ten-hour shifts during a four-day work week. Greene Deposition, at 31. Plaintiff was the only staff nurse allowed to work eight-hour days in a five-day work week. *Id.,* at 32. She was also the only staff nurse who did not have to take calls for the acute care unit. *Id.,* at 36. On January 14, 1997, Defendant provided Plaintiff with a schedule for light duty work incorporating her physician's restrictions and she returned to work the next day. Exhibit 6, Letter dated January 15, 1997, *attached to* Defendant's Motion.

Despite the restrictive work schedule, Plaintiff's condition did not improve and by the end of February 1997, her doctor determined that surgery would be necessary. Greene Deposition, at 46. Moreover, he reinstated a four-hour work day restriction. *Id.* On March 7, 1997, Plaintiff was placed on a 30–day personal leave of absence from work; however, the Defendant continued to pay her health insurance premiums. *Id.,* at 47; Exhibit 7, Letter dated March 7, 1997, *attached to* Defendant's Motion. According to the Plaintiff, her supervisor told her that if she did not return to work after this leave she would lose her job. Greene Deposition, at 27. Chris King, another manager, advised Plaintiff that "by law" the Defendant did not have to continue her employment. *Id.* Plaintiff returned to work in April 1997; however, she felt discriminated against because she was forced to work every weekend. *Id.,* at 29, 59. She also felt that she "was not welcome there anymore ..." and that the atmosphere had changed. *Id.,* at 29, 58.

After the surgery, Plaintiff's physician continued to restrict her work, alternating between six and eight-hour work days. *Id.,* at 59. She was never released to work

10–hour shifts like the other staff nurses. *Id.* Moreover, she was unable to handle acute situations during which CPR[1] might be necessary. *Id.,* at 82, 84.

Plaintiff received a glowing performance appraisal in November 1997, despite the fact that she continued to work under restrictions. Exhibit 21, Performance Appraisal, dated November 25, 1997, *attached to* Defendant's Motion; Greene Deposition, at 114. Moreover, this appraisal was given after the Plaintiff had pursued a workers' compensation claim against the Defendant in connection with her earlier injury. *Id.,* 114–15. In fact, Plaintiff had refused to sign documents which would have settled that claim, yet her employment was not impacted.

Despite her positive performance evaluation, Plaintiff continued to feel that her employer wanted her to quit. She was disciplined, unreasonably in her opinion, in January 1998 for excessive absenteeism. *Id.,* 61–62. During the counseling session in connection with that discipline, Plaintiff's supervisor told her that he knew she had retained an attorney. *Id.* And, she was told that if she was unhappy at work, she should leave. *Id.* Due to administrative changes at the facility, Plaintiff's position, like that of other staff nurses, was changed from time to time. *Id.,* at 66. This, however, was not unique to the Plaintiff. *Id.*

On January 26, 1998, the Plaintiff was formally disciplined and counseled about excessive absenteeism which was defined as exceeding three percent in a three-month period. Exhibit 8, Report of Employee Counseling, dated January 26, 1998, *attached to* Defendant's Motion. At that time, her absenteeism rate was 12.5 percent for the previous three-month period and 9.4 percent for the past six-month period. *Id.* She was notified that future problems "[would] result in further discipline or possible termination." *Id.*

On March 11, 1998, Plaintiff re-injured her back when she slipped on ice while moving a patient at work. Greene Deposition, at 66, 69. On May 1, 1998, her physician released her to return to work with the following restrictions: (1) no lifting over 10 pounds; (2) no repetitive bending, crawling or squatting; and (3) light duty only. Exhibit 10, Physician's Release, dated May 1, 1998, *attached to* Defendant's Motion. However, her back did not improve and in June 1998 a second surgery was performed. Greene Deposition, at 75. On July 17, 1998, her doctor released her to return to work with a permanent restriction of eight-hour days not to exceed a 40–hour work week and other restrictions of no lifting over 20 pounds and no repetitive bending. Exhibit 11, Physician's Release, dated July 17, 1997, *attached to* Defendant's Motion. This meant the Plaintiff was prohibited from providing life support functions such as CPR and moving patients into a Trendelburg position when complications arose during dialysis. Greene Deposition, *supra;* Fore Affidavit. These functions were critical components of the position of staff nurse. *Id.* On July 20, 1998, Plaintiff was notified by the Defendant that her medical leave would expire on July 25 and that she would be granted a 30–day period of personal leave if she so requested. Exhibit 12, Letter dated July 20, 1998, *attached to* Defendant's Motion. Her attorney responded that she desired to return to work on a light duty basis. Exhibit 13, Letter dated July 24, 1998, *attached to* Defendant's Motion.

According to the Plaintiff, her physician released her to return to work on August

---

1. Cardiopulmonary resuscitation.

25, 1998, however, he continued to impose the same restrictions. Greene Deposition, at 92, 96. On that same date, her supervisor hand-delivered a letter to the Plaintiff advising that her personal leave had expired and giving her until August 31, 1998, to request another 30–day personal leave period. Exhibit 14, Letter dated August 25, 1998, *attached to* Defendant's Motion. Plaintiff was notified in this letter that under the Defendant's benefits policy, "there is no guarantee of a return to employment at the end of your leave." *Id.* On August 31, 1998, Plaintiff, through her attorney, requested a 30–day extension of her personal leave. Exhibit 15, Letter dated August 31, 1998, *attached to* Defendant's Motion. That request was granted on September 7, 1998. Exhibit 16, Letter dated September 7, 1998, *attached to* Defendant's Motion. On September 25, 1998, the Plaintiff's personal leave had expired and she was terminated from employment because there were no staff nursing positions available. Greene Deposition, at 99. She was advised that she could apply for a nursing position as one might become available, however, Plaintiff did not do so. *Id.,* at 100. It is unclear from the record when the Plaintiff filed her second workers' compensation claim.

### III. DISCUSSION

■ REDA replaced North Carolina General Statutes section 97–6.1, the purpose of which was to promote an open environment in which employees could pursue remedies under the Workers' Compensation Act without fear of retaliation from their employers. The former law merely protected employees against discharge and demotion. By enacting REDA, however, the General Assembly expanded the definition of retaliation to include "the discharge, suspension, demotion, retaliatory relocation of an employee, or other adverse employment action taken against an employee in the terms, conditions, privileges and benefits of employment." [However] an employee bears the burden of proof in retaliatory discharge actions. The statute does not prohibit all discharges of employees who are involved in a workers' compensation claim, it only prohibits those discharges made *because* the employee exercises his compensation rights.

*Johnson v. Trustees of Durham Technical Cmty. Coll.,* 139 N.C.App. 676, 681–82, 535 S.E.2d 357, 361 (2000) (internal quotations and citations omitted). Thus, in order to state a *prima facie* case of retaliatory discharge due to the filing of a workers' compensation claim, a plaintiff must show (1) that she was discharged; (2) that she filed a workers' compensation claim, or was about to do so; and (3) retaliatory motive was a substantial factor in the decision to terminate employment. *Abels v. Renfro Corp.,* 335 N.C. 209, 217, 436 S.E.2d 822, 826 (1993); *Wiley v. United Parcel Service, Inc.,* 102 F.Supp.2d 643, 650 (M.D.N.C.1999), *aff'd,* —— F.3d ——, 2001 WL 431478 (4th Cir.2001). "[A] plaintiff fails to make out a case of retaliatory action where there is no close temporal connection between the filing of the claim and the alleged retaliatory act." *Johnson, supra.*

■ As to the Plaintiff's first workers' compensation claim, there is no doubt that she has failed to make out a *prime facie* case. Her discharge occurred over two years after the initial injury. *Id.* Yet, during that time, the Defendant accommodated her physician's work restrictions and, despite her claim that the work "atmosphere" changed, she received a positive performance evaluation.[2] *Ennis v.*

---

**2.** Plaintiff argues, without any evidence in the

record beyond her testimony, that she refused

*Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 61–62 (4th Cir.1995); *Johnson v. Runyon,* 151 F.3d 1029 (table), 1998 WL 372473, at *2 ("A subjective belief of [retaliation], however genuine, [cannot] be the basis of judicial relief." (citations omitted)). There is simply no evidence that her discharge in 1998 was "substantially related" to the filing of a workers' compensation claim for the 1996 injury.

■■ Plaintiff urges the Court to find a temporal connection between her second injury and her termination, thus allowing her to make a *prima facie* case as to that injury.[3] Assuming *arguendo* that a *prime facie* case is made, Plaintiff fares no better. The Defendant has shown "by the greater weight of the evidence that it would have taken the same unfavorable action in the absence of the protected activity of the employee." N.C. Gen.Stat. § 95–241(b). Plaintiff was never released by her physician to perform the full range of duties of a staff nurse. *Wiley,* 102 F.Supp.2d at 653 ("[T]he company was not required to place Plaintiff in a position that exceeded his medical limitations."). The extraordinary measures taken by the Defendant to accommodate her doctor's restrictions belie any claim that the company had an incentive to discharge her after her second injury. *Id.,* at 651 n. 12 ("This conduct on the part of [the employer] does not give rise to an inference of retaliatory motive."). Moreover, the Defendant provided the Plaintiff with extensive periods of personal leave so that she could recover.[4] See, Exhibit 2, Personal Leave Policy, *attached to* Defendant's Motion ("At the end of the [personal] leave[,] [Defendant] at its sole discretion, will attempt to place the employee in any available position for which the employee is qualified."). Finally, when all her medical and personal leave had expired, the company discharged her because it had no openings for a staff nurse. She was encouraged to apply for a nursing position when one became available, however, Plaintiff acknowledges she never did so due to her belief of retaliation. This is insufficient to show that the Defendant "would [not] have taken the same unfavorable action in the absence of the protected activity." *Barrett v. Applied Radiant Energy Corp.,* 240 F.3d 262, 268 (4th Cir.2001) (The plaintiff's subjective belief in the futility of action is not reasonable.); *Wiley,* 102 F.Supp.2d at 652–53 ("Plaintiff has failed to establish a causal connection between the filing of his claims and any adverse employment action . . . . Plaintiff's evidence is based on conclusory allegations and his subjective belief that he is the victim of retaliation. This evidence is insufficient to withstand summary judgment.").

■ Finally, applying the burden shifting scheme used in federal court, Plaintiff has failed to show that the Defendant's explanation for termination is pretextual. *Abels,* 335 N.C. at 218, 436 S.E.2d at 827 (North Carolina courts look to federal decisions for guidance in this area.).

> [In order] to survive a motion for summary judgment . . . the plaintiff must do more than merely raise a jury question about the veracity of the employer's proffered justification. The plaintiff

to sign documents which would have settled her first workers' compensation claim. Thereafter, she claims, the work atmosphere deteriorated. Defendant's consistent accommodation of her needs and the favorable performance evaluation in November 1997 dispel this argument.

3. Plaintiff was discharged approximately six months after the second injury.

4. After the March 1998 injury, Plaintiff received medical leave followed by three periods of personal leave consisting of 30 days each. Fore Affidavit, *supra.*

must have developed some evidence on which a juror could reasonably base a finding that [retaliation] motivated the challenged employment action. [A]n employer is entitled to summary judgment unless the [ ] plaintiff has adduced sufficient evidence both that the reason was false, and that [retaliation] was the real reason. This approach, dubbed "pretext-plus," is a better approach than "pretext only." Pretext-plus best preserves the character of statutes like the [REDA] as anti[retaliation] statutes. [T]he [REDA] does not award damages against employers who cannot prove a non[retaliatory] reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of [retaliation]. Of course, the simple fact [t]hat the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of [retaliation] is correct. [N]othing in law would permit [a court] to substitute for the required finding that the employer's action was the product of unlawful [retaliation], the much different (and much lesser) finding that the employer's explanation of its action was not believable.

*Vaughan v. The MetraHealth Companies, Inc.,* 145 F.3d 197, 202 (4th Cir.1998) (internal quotations and citations omitted). Plaintiff has failed to meet the "pretext-plus" approach followed in this Circuit.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion for summary judgment is hereby **GRANTED**. A Judgment dismissing this case in its entirety is filed herewith.

**IT IS FURTHER ORDERED** that the Defendant's motion for continuance is hereby **DENIED** as moot.

## MEMORANDUM AND RECOMMENDATION

**THIS MATTER** is before the court upon defendant's Motion for Summary Judgment. Having carefully considered that motion and reviewed the pleadings, the undersigned enters the following findings, conclusions, and recommendation.

## FINDINGS AND CONCLUSIONS

### I. Jurisdiction

This matter was timely removed from state court under this court's diversity jurisdiction. Plaintiff alleges one claim: defendant violated North Carolina's "Retaliatory Employment Discrimination Act," (hereinafter "REDA"), which prohibits employers from discriminating or retaliating against employees based upon good-faith claims for workers' compensation. N.C. Gen.Stat. § 95–241(a). It appearing that complete diversity exists between the parties and that the amount in controversy exceeds the statutory minimum of $75,000, this court has jurisdiction over this matter.

### II. Background

Defendant is a nonprofit corporation providing dialysis and related medical services to patients with end-stage renal failure. Plaintiff worked for defendant as a nurse and was employed in defendant's Shelby, North Carolina, clinic for 10 years before her employment was terminated. During her employment, plaintiff sustained two separate work-related injuries and claims herein that she was terminated in retaliation for her pursuit of workers' compensation benefits with respect to both injuries.

The undisputed facts show that on September 20, 1996, plaintiff injured her lower back while at work. In early October of that year, plaintiff's physician indicated

that plaintiff should remain off work for a period of time, and plaintiff was provided a leave of absence from work beginning on October 9, 1996.

By letter dated November 21, 1996, defendant informed plaintiff that her medically excused absences qualified for and would be treated as leave under the Family and Medical Leave Act ("FMLA"), effective October 9 (the date of her first absence), and that her leave under the FMLA would expire on January 1, 1997. (Plaintiff has made no claim under the FMLA.) Plaintiff, thereafter, requested and was granted an extension of her leave until January 9, 1997.

On January 9, 1997, plaintiff received a note from her physician releasing her to "light duty" with significant restrictions. Defendant allowed plaintiff to return to work in a job created to accommodate her limitations, with a plan for plaintiff to return to full duty through an incremental increase in her hours.

On February 21, 1997, plaintiff's physician indicated that she would have to undergo surgery. On March 7, 1997, plaintiff was placed on a 30–day personal leave of absence. Inasmuch as plaintiff had exhausted her available leave time under the FMLA, the only leave to which she was entitled was a personal leave of absence under defendant's leave policy. In accordance with that policy, plaintiff was not guaranteed reemployment at the end of her leave. Plaintiff has alleged, and the court has taken as true, that when she took the personal leave of absence, her supervisor at the time, Sharon Padgett, told her that if she was not back at work in 30 days, she would lose her job.

Plaintiff underwent the recommended surgery on March 10, 1997, and was released to return to limited duty on April 7, 1997. Plaintiff's treating physician restricted her to lifting no more than 20 pounds and working no more than four hours per day. Defendant accommodated those restrictions and allowed plaintiff to return to work. Her doctor allowed her working hours to increase to six hours a day on June 5, 1997, and to eight hours effective July 18, 1997. Eight hours, however, were not a full work day at defendant's clinic, which scheduled nurses for 10–hour shifts, four days a week. Plaintiff was the only staff nurse with a more limited schedule. During this time, plaintiff admits, she was not able to take "call," which every other staff nurse was required to take.

After returning to work with accommodations, and even after having filed her first worker's compensation claim, plaintiff received an above-average performance evaluation on November 25, 1997, and was given more responsibility as an alternate charge nurse. Plaintiff finds fault with her treatment during that period:

(1) during June 1997, Chris King, a representative of defendant, informed her that defendant was not required by law to keep her in its employment, given her inability to perform more than a part-time job; and

(2) during the period after she returned to work following surgery, she contends that she was required to work on weekends so that defendant could avoid paying overtime pay to other nurses, who had already worked 40 hours in four shifts.

Plaintiff continued working eight-hour shifts through a second injury that she sustained in March 1998. During that time, plaintiff received counseling from defendant concerning certain unexcused absences from work. Plaintiff contends that during the January 1998 counseling session, her new supervisor, Bryan Fore, told

her that if she was unhappy working for defendant, she needed to leave.

On March 11, 1998, plaintiff suffered another injury to her back when she slipped on some spilled ice on the floor while moving a patient. After the injury, plaintiff continued to work under her previous restrictions. Plaintiff then filed her second workers' compensation claim, and defendant continued to allow her to work.

On May 1, 1998, however, plaintiff's physician placed her on more severe restrictions, including no lifting over 10 pounds, no repetitive bending, crawling, squatting, and a notation of "light duty." Defendant contends that because of these limitations, plaintiff could not perform the essential functions of her job, and defendant placed her on a leave of absence under the FMLA effective May 2, 1998.

Defendant concluded, based on plaintiff's new restrictions, that plaintiff was unable to perform basic life support functions, such as CPR and placing patients in the Trendelburg position. Plaintiff was also unable to transfer, ambulate, and move patients from a sitting to a standing position without assistance.

Plaintiff remained on FMLA leave and on June 22, 1998, underwent another surgical procedure on her back. After surgery, she remained on leave, and by letter dated July 20, 1998, defendant notified her that her leave under the FMLA would expire on July 25, 1998; it would grant her an additional 30–day personal leave of absence, if she desired; and she was not guaranteed employment at the expiration of the 30–day personal leave. At the conclusion of the FMLA leave, plaintiff requested an extension of her leave, and defendant granted an additional 30–day personal leave of absence.

By letter dated August 25, 1998, defendant notified plaintiff that her personal leave of absence had expired as of August 24, 1998. Defendant stated that since it had not heard from plaintiff about further extending her leave, it was assumed that she did not wish to return to work. By responsive letter from her attorney dated August 31, 1998, she requested an extension of her personal leave. Although not obligated to do so, defendant granted the request and enlarged plaintiff's personal leave of absence until September 23, 1998.

On September 25, 1998, defendant notified plaintiff that her personal leave ended September 23, 1998, that no registered nurse positions were available, her personal leave could not be further extended, and she was welcome to reapply as positions became available.

Among plaintiff's contentions in this action are the following:

(1) she should not have been placed on a leave of absence in May 1998, because even though she had severe restrictions, she still could work;

(2) on August 25, 1998—the day one of her leaves of absence expired—she was released by her physician to return to work:

(a) she went to the clinic with the doctor's release, indicating that she could work only a limited number of hours for several weeks and placing her again on certain physical restrictions;

(b) when she arrived at the clinic, the charge nurse asked if she was now back at work and that she needed to first speak with Bryan Fore, the administrator;

(c) plaintiff later returned to the clinic to speak with Bryan Fore, who gave her the note indicating that she had not notified defendant of her desire to extend her leave of absence; and

(d) Bryan Fore told plaintiff that she could have more time to think about whether she wanted an extension to her leave.

It is undisputed that between August 25 and September 24, 1998, when plaintiff attempted to return to work, no registered nurse positions were available. Plaintiff has admitted that she did not expect defendant to place her in a staff nurse position if it meant removing an incumbent employee from that job.

### III. Summary Judgment Standard Generally

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the nonmoving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [sic] party, there is no "genuine issue for trial."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted; emphasis in the original) (quoting Fed.R.Civ.P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. *Id.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

> [T]he court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable (however improbable they may seem).

*Cole v. Cole,* 633 F.2d 1083, 1092 (4th Cir.1980). Affidavits and other evidentiary material filed in support of defendant's Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3d Cir.1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. *Davis v. Zahradnick,* 600 F.2d 458 (4th Cir.1979).

### IV. Discussion

#### A. The Nature of a REDA Claim

The North Carolina Retaliatory Employment Discrimination Act ("REDA") prohibits employers from discriminating or retaliating against employees based upon good-faith claims for workers' compensation. N.C. Gen.Stat. § 95–241(a). To prevail, the employee must prove that retaliation for *seeking workers' compensation benefits* was a substantial factor in the adverse employment action taken by the employer. *Wiley v. United Parcel Service, Inc.,* 102 F.Supp.2d 643, 650 (M.D.N.C.1999).

> [The statute] does not prohibit all discharges of employees who are involved

in a workers' compensation claim; it prohibits only those discharges made because the employee exercises his compensation rights. The burden of proof in a retaliatory discharge action is on the employee.

*Id.*, at 650 (*quoting Morgan v. Musselwhite*, 101 N.C.App. 390, 393, 399 S.E.2d 151, *disc. review denied*, 329 N.C. 498, 407 S.E.2d 536 (1991)).

## B. Establishing a *Prima Facie* Case

Plaintiff has admitted that she has no direct evidence of retaliation. *See* Greene Depo., at 29–30. A plaintiff may, however, establish a case of retaliatory discharge through use of a "*McDonnell Douglas* scheme," *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991)—a system of analysis which courts have adopted from Title VII to consider state-law claims made under REDA. *Wiley, supra.*

To make out a *prima facie* case of retaliation, plaintiff would have to show the following:

(1) defendant was aware that she engaged in a protected activity;

(2) plaintiff suffered an adverse employment action; and

(3) the two are causally related.

*Id.*, at 650. If plaintiff can establish a *prima facie* case, the burden would then shift to the employer to articulate a legitimate, nonretaliatory reason for the employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Upon such a showing by the employer, the burden would then shift back to the plaintiff to show by a preponderance of the evidence that the legitimate reasons offered by the employer were not true reasons, but were pretext for retaliation. *Id.* To make such a showing, the plaintiff must prove that "but for" the protected conduct, the adverse employment action would not have occurred.

Without doubt, plaintiff has presented evidence that defendant knew of the workers' compensation claim and that she suffered an adverse employment action. Plaintiff, therefore, has satisfied the first two elements of a *prima facie* case.

Plaintiff, however, has presented no evidence of any causal link between the first two elements that would satisfy the third element of a *prima facie* case. Close temporal proximity between the first two elements has been held to satisfy the third element in the context of Title VII claims. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir.1994) (five months); *Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir.1989) (four months). Likewise, distant temporal proximity may indicate no retaliatory motivation. *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739 (11th Cir.1996).

Plaintiff's last workers' compensation claim was submitted on March 11, 1998. *See* Exhibit 9, defendant's Appendix of Documents Cited. On September 25, 1998, defendant sent plaintiff a letter indicating that no available registered nurse positions in which she could placed at the expiration of her extended personal leave of absence. More than six months had passed between the last claim for compensation and the complained-of adverse employment action.

In determining close temporal proximity in the context of workers' compensation retaliation cases, North Carolina courts (and federal courts sitting through diversity jurisdiction) appear to require even narrower margins between the last claim for compensation and the adverse employment action than do federal courts in the context of Title VII claims. In *Wiley*, the plaintiff's last workers' compensation claim was

submitted in November 1996, which was five months before his discharge in April 1997. The *Wiley* court found that the events were "not sufficiently close in time to establish causal connection." *Id.* Likewise, the six-month period between events in this case was not sufficiently close to satisfy plaintiff's burden of proof. *Shaffner v. Westinghouse Elec. Co.*, 101 N.C.App. 213, 216, 398 S.E.2d 657 (1990) (finding no close temporal connection where a plaintiff was terminated three months after instituting a workers' compensation claim).

In addition to a lack of temporal proximity, the overwhelming evidence in this case is antithetical to plaintiff's claim of retaliation. It is undisputed that even after plaintiff filed her first claim, defendant accommodated her limitations in a number of ways that it was not otherwise obligated to do:

> (1) defendant provided plaintiff extensive leave, above and beyond what was required by FMLA or company policy;
> (2) defendant created what can best be described as a "new job" that accommodated plaintiff's physical limitations and restrictions as to her time at work;
> (3) plaintiff's supervisor gave plaintiff an "above-average" rating and more responsibility even after the first claim for benefits; and
> (4) even after the second claim for benefits, defendant continued to grant leave requests and went so far as to extend leave even after leave had expired.

After her second injury in March 1998 (and second claim for benefits), plaintiff remained on the payroll until her own treating physician placed restrictions which, she admits, prevented her from performing *essential* life-sustaining duties of a registered nurse in a dialysis unit. Even then, defendant continued to grant plaintiff leave. Plaintiff was only terminated after

her extensive leave time had expired and, undisputedly, no positions were available for her to return. In addition, she was invited to reapply for any position when one became available.

Even if plaintiff had been able to establish a *prima facie* case, defendant has shown legitimate, nonretaliatory reasons for its decision to terminate plaintiff's employment—the expiration of leave and no available job. In attempting to rebut that showing, plaintiff argues that in March 1997, when she was placed on leave for her first surgery, her supervisor at the time, Ms. Padgett, told her that if she was not back at work in 30 days, she would be terminated. Rather than proof of pretext, that statement was an accurate reflection of defendant's leave policy.

■ Plaintiff also contends that another agent of defendant told her in 1997 that defendant was not required by law to keep her in its employment, given her inability to perform more than a part-time job. While not a pleasant thing for anyone to hear, it was a truthful statement. Truthful statements simply cannot form the basis of showing pretext.

Plaintiff also claims that she should not have been placed on leave when she attempted to return to work after the March 1998 injury. While plaintiff wanted to work, even she admits that her doctor's more severe restrictions on lifting (not to exceed 10 pounds) prevented her from performing essential, life-preserving functions of a dialysis unit registered nurse.

Plaintiff also contends that on August 25, 1998—the very day that one of her leaves of absence expired—she was released by her physician to return to work. There is no dispute that from her release (with substantial restrictions) on August 25, 1998, through the end of her leave on September 24, defendant had no vacant

staff nurse positions available. Plaintiff admits that she did not expect defendant to place her in a staff nurse position if it meant removing an incumbent employee from that job.

■ None of the arguments presented by plaintiff would support a showing of pretext. All that remains is plaintiff's speculation and conjecture that retaliation for submitting a workers' compensation claim was the real motive. Speculation and conjecture raise a mere possibility of unlawful conduct rather than the reasonable probability which is necessary to support an inference of retaliation. *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 241–42 (4th Cir.1982). Speculative assertions that a defendant's motivation was unlawful is not enough to withstand summary judgment, *Goldberg v. B. Green and Co.*, 836 F.2d 845, 848 (4th Cir.1988); and conclusory statements will not satisfy plaintiff's burden in responding to the motion for summary judgment, *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211 (4th Cir.1987). Unsupported allegations "do not confer talismanic immunity from Rule 56." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, at 365 (4th Cir.1985). This court cannot allow a jury to decide issues based on speculation. Rules 401 and 602, Fed. R. of Evid. Finding that plaintiff has failed to establish a causal connection between the first two elements, the undersigned will recommend that summary judgment be granted in favor of defendant, inasmuch as plaintiff has not established a *prima facie* case. Alternatively, if plaintiff could have established a *prima facie* case, the court finds that summary judgment would be entered against her, inasmuch as defendant has articulated a legitimate, nondiscriminatory reason for her discharge, to which plaintiff has not shown pretext.

Finally, defendant has asserted that summary judgment should be summarily imposed, inasmuch as plaintiff failed to file her response within the time allowed by this court. Plaintiff has not responded to that request. Having determined that defendant is entitled to summary judgment on the merits, the undersigned cannot, in good conscience, recommend that plaintiff's case be dismissed based on procedural default. While counsel for plaintiff has utterly failed to show "excusable neglect" as required by Rule 6, Federal Rules of Civil Procedure, plaintiff's "Motion for New Trial Date" (which was denied as moot based on the pendency of this dispositive motion) indicates that counsel for plaintiff underwent extensive facial surgery for a cancerous tumor in close proximity to the time the brief was due in this matter. Inasmuch as the district court determined that this matter would not be placed on a trial calendar, plaintiff's untimely submission has not impacted this court's consideration of the substantive motion. To that end, the undersigned recommends that counsel's error not be attributed to the client and that such motion to dismiss based on procedural default be denied.

**RECOMMENDATION**

IT IS, THEREFORE, RESPECTFULLY RECOMMENDED that

(1) defendant's Motion for Summary Judgment be **ALLOWED** for the reasons discussed above; and

(2) defendant's motion to dismiss based upon the failure of plaintiff's counsel's to timely submit a responsive brief be **DENIED.**

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be

filed within ten (10) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

This Memorandum and Recommendation is entered in response to defendant's Motion for Summary Judgment (# 8) and motion to dismiss (contained in defendant's Reply (# 18)).